# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 21-567V
### Filed: November 20, 2025

|  |  |
|---|---|
| JULIE CAVANAUGH, | Special Master Horner |
| Petitioner, | |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Zachary James Hermsen, Whitfield & Eddy Law, Des Moines, IA, for petitioner.*
*Ryan Nelson, U.S. Department of Justice, Washington, DC, for respondent.*

### DECISION[1]

On January 11, 2021, petitioner filed a petition under the National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that she suffered a Table Injury of a shoulder injury related to vaccine administration ("SIRVA") affecting her right shoulder and following an influenza ("flu") vaccination she received on January 14, 2020. (ECF No. 1.) For the reasons set forth below, I conclude that petitioner is *not* entitled to compensation.

## I.    Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious, long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-13(a)(1)(A); § 300 aa-11(c)(1)(C)(i); § 300aa-14(a); § 300aa-13(a)(1)(B).

As relevant here, the Vaccine Injury Table lists SIRVA as a compensable injury if it occurs within 48 hours of vaccine administration. § 300aa-14(a), *amended by* 42 C.F.R. § 100.3. Table Injury cases are guided by statutory "Qualifications and aids in interpretation" ("QAI"), which provide more detailed explanation of what should be considered when determining whether a petitioner has suffered an injury listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(c). To be considered a "Table SIRVA," a petitioner must show that his/her injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i)    No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii)   Pain occurs within the specified time-frame;
>
> (iii)  Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv)   No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, and any other neuropathy).

42 CFR § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question.  § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii).  To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury."  *Moberly v. Sec'y of Health & Human Servs*., 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs*., 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs*., 451 F.3d 1352, 1355 (Fed. Cir. 2006).  In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact.  *Althen v. Sec'y of Health & Human Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and Non-Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence".  § 300aa-13(a)(1).  That is, a petitioner must present evidence sufficient to show that "the existence of a fact is more probable than its nonexistence . . . ."  *Moberly*, 592 F.3d at 1322 n.2.  Proof of medical certainty is not required.  *Bunting v. Sec'y of Health & Human Servs*., 931 F.2d 867, 872-73 (Fed. Cir. 1991).  However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician.  § 300aa-13(a)(1).  Once a petitioner has established their *prima facie* case, the burden then shifts to respondent to prove, also by preponderant evidence, that the alleged injury was caused by a factor unrelated to vaccination.  *Althen*, 418 F.3d at 1278 (citations omitted); § 300aa-13(a)(1)(B).

## II.    Procedural History

Based on the allegations in the petition, this case was initially assigned to the Chief Special Master as part of the Special Processing Unit ("SPU"), which is intended to expedite cases having a high likelihood of informal resolution.  (ECF Nos. 10, 12.)  The petition was accompanied by medical records and declarations marked as Exhibits 1-7.  (ECF No. 1.)  After the case was assigned to the SPU, petitioner filed additional records marked as Exhibits 9-15.  (ECF Nos. 15-17, 24-25, 28-29.)

Thereafter, a status conference was held with the Chief Special Master, during which he advised that he felt there were factual issues to be resolved with respect to

3

petitioner's alleged SIRVA.  (ECF No. 33.)  Following on from that discussion, petitioner filed a motion for a ruling on the written record, seeking a finding that petitioner is entitled to compensation for a Table SIRVA.  (ECF No. 36.)  Petitioner also filed an additional declaration marked Exhibit 16.  (ECF No. 34.)  Respondent then filed his Rule 4(c) Report and a response to the motion, raising issues of injection situs, onset, and symptoms inconsistent with SIRVA (specifically, numbness and tingling down to the forearm).  (ECF Nos. 39-40.)  Respondent also contended that the medical records did not demonstrate causation-in-fact.  (*Id.*)  Based on a preliminary review, the Chief Special Master felt that it was "highly unlikely" petitioner could demonstrate a Table SIRVA due primarily to the question of onset.  (ECF No. 43, p. 2.)  However, he felt it might be possible that petitioner could demonstrate that her initial constellation of post-vaccination symptoms (which were not reflective of SIRVA) "ultimately led to her later *SIRVA-like* presentation."  (*Id.* at 4.)  Thus, he reassigned the case to the undersigned for further litigation.  (*Id.* at 4-5; ECF No. 44.)  Although he gave preliminary guidance, the Chief Special Master did not rule on petitioner's pending motion.  (*See* ECF No. 43.)

After the case was reassigned, I issued an order denying petitioner's motion for a ruling on the written record without prejudice to refile.  (Non-PDF Order, filed Jan. 23, 2024.)  I explained that I did not feel the case was ripe for a ruling in light of the Chief Special Master's preliminary guidance.  (*Id.*)  Instead, I directed petitioner to file an expert report supporting her claim.  (Non-PDF Scheduling Order, filed Jan. 23, 2024.)  Petitioner then filed a report by Naveed Natanzi, D.O.  (ECF No. 47; Exs. 17-39.)  Following this filing, I issued a Rule 5 Order.  (ECF No. 50.)  I advised the parties that, based on my review, it appeared that Dr. Natanzi had challenged the Chief Special Master's preliminary assessment of onset rather than seeking to show that an initial constellation of non-SIRVA symptoms had led to a later SIRVA-like sequela.  (*Id.* at 2-3.)  I cautioned that I was inclined to agree with the Chief Special Master and that Dr. Natanzi had not persuaded me otherwise.  (*Id.* at 3.)  I permitted a fact hearing to further probe the question of onset.  (*Id.* at 4.)

A fact hearing was held on August 2, 2024.  (ECF No. 54; *see* Transcript of Proceedings ("Tr."), at ECF No. 57.)  Petitioner and her daughter, Ms. Parker, testified.  (Tr. 5, 110.)  In connection with the hearing, additional exhibits relating to the pharmacy where petitioner was vaccinated were filed as Exhibits 40-42.  (ECF Nos. 55, 64.)  Thereafter, the parties agreed that the case is ripe for written briefing pursuant to Vaccine Rule 8(d).  (ECF No. 66.)  Petitioner then filed a motion for a ruling on the written record.  (ECF No. 67.)  That motion is fully briefed.  (ECF Nos. 68 (response) and 69 (reply).)

In her motion, petitioner summarizes the record evidence and argues that it supports a right-side administration of the subject vaccine followed by an injury that satisfies the criteria for a Table Injury of SIRVA.  (ECF No. 67.)  Petitioner alternatively asserts she should be found entitled to compensation for an injury caused-in-fact by her vaccination (*Id.* at 10); however, the basis for this argument is not explained.  In response, respondent contends that a right-side administration is not preponderantly supported, and that petitioner has neither demonstrated onset of shoulder pain within 48

hours of vaccination or that her alleged pain and reduced range of motion were limited to her affected shoulder (*i.e.* SIRVA criteria (ii) and (iii)).  (ECF No. 68.)  Respondent further contends that petitioner's motion is inadequate to raise an alternative cause-in-fact claim, which, in fact, was not pleaded in the petition.  (*Id.* at 18-19.)

In light of the above, I have determined that the parties have had a full and fair opportunity to develop the record and that it is appropriate to rule on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record").  Accordingly, petitioner's motion is now ripe for resolution.

### III.    Summary of Record Evidence

Petitioner received the flu vaccination at issue at HyVee pharmacy on January 14, 2020.  (Ex. 1, p. 1.)  Prior to the vaccination, petitioner had issues with cholesterol, blood pressure, mild depression and anxiety, agoraphobia,[3] and stomach digestion. (Tr. 7-8; Ex. 12, pp. 9-87.)  Petitioner testified that she is afraid of receiving vaccinations, but felt she needed to get the flu vaccine due to her advancing age and her physician's recommendation.  (Tr. 10.)  She decided to get the vaccine on a walk-in basis while she was grocery shopping.  (*Id.*)

The computer-generated receipt indicates that the vaccine was given intramuscularly into the left arm.  (Ex. 1, p. 1.)  However, the consent form filled out by hand by the administrator at the time of vaccination left the site of administration blank. (*Id.* at 6.)  Petitioner testified that she received her vaccination in her right arm.  (Tr. 11, 42.)  She further testified that, when she followed up with the pharmacy regarding the incorrect record, she was told the "left" arm notation was a default.[4]  (*Id.* at 41, 96-97.) Petitioner also testified the vaccine was administered "[r]eal high" and higher than she normally would have expected, closer to the top of the shoulder than the deltoid.  *(Id.* at 12-13.)

Petitioner described having a bad experience with the person who administered her vaccination.  (Tr. 11-14, 60-65.)  Specifically, petitioner testified that she questioned the administrator's qualifications because she had perceived her as being young, about 19 or 20 years old.  (*Id.* at 11, 62.)  Thereafter, "she gave me a really, really, really nasty

---

[3] Agoraphobia is an "intense, irrational fear of open spaces, characterized by marked fear of venturing out alone or of being in public places where escape would be difficult, or help might be unavailable.  It may be associated with panic attacks."  *Agoraphobia*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=1402 (last visited Nov. 19, 2025).

[4] Petitioner's suggestion that the pharmacy defaulted to documenting a left-side administration is consistent with prior program experience.  *E.g.*, *Hanna v. Sec'y of Health & Human Servs.*, No. 18-1455V, 2021 WL 3486248, at *8 (Fed. Cl. Spec. Mstr. July 15, 2021) (discussing prior cases where pharmacies documented "left" arm administrations presumptively).  However, it is not ultimately necessary to resolve the site of injection in this case.  In light of the analysis that follows, it is sufficient to assume, without deciding, that petitioner received her vaccination in her right shoulder as alleged.

look, and she was mad.  And she lifted up my shoulder and said, Yes, I've a nursing student,[5] and jabbed me, before, I mean, I could even say anything, because I wanted it in my left arm, but she rolled up the sleeve of my right arm, jabbed it in . . . ." (*Id.* at 11.)  Petitioner asserted that the administrator was "really mean" to her and jabbed the needle in order to intentionally injure her.  (*Id.* at 63, 69-70.)  Petitioner testified that "I've never had any pain like this in my life . . . and I know it went through a muscle or bone or something, because I let out a scream.  I was crying.  People were looking." *(Id.* at 11-12.)  On cross-examination, however, petitioner conceded that she was not actually crying, though she maintained that she felt embarrassed, presumably because of having yelled out.  (*Id.* at 70.)  During cross examination, she admitted to having had an exaggerated perception when she had suggested, as she did in later histories discussed below, that the vaccine was administered using an unusually large needle, attributing this to her fear of shots.  (*Id.* at 84-85.)  However, she denied that her fear colored her impression of the interaction with the vaccine administrator.  (*Id.*)

In later written statements and in her testimony, petitioner averred that she went home directly from receiving the vaccination and confided in her adult daughter, who lived with her, that she had a bad interaction with the vaccine administrator and that her shoulder was very painful.  (Tr. 13-14; Ex. 4, p. 1.)  During the hearing, her daughter, Ms. Parker, corroborated this aspect of petitioner's account.  (Tr. 111-14, 136-37.)  Notably, however, petitioner acknowledged during the hearing that she had drafted Ms. Parker's original written account.  (*Id.* at 103 (discussing Ex. 5); *see also id.* at 120, 125.)  Nonetheless, Ms. Parker asserted that "everything in this statement is correct."[6] (*Id.* at 120.)  Shortly after arriving home, petitioner experienced a number of systemic symptoms.  (*Id.* at 15-16.)

Two days post-vaccination, on January 16, 2020, petitioner e-mailed her primary care provider, with a subject line of "Non-Urgent Medical Question."  (Ex. 2, p. 1.)  Petitioner's e-mail reported her systemic symptoms but included no discussion of any arm or shoulder pain.  (*Id.*)  She wrote in full:

> I went to get a flu shot 2nd time in my life I went tot [sic] Hy Vee on the 14th at 5:00 PM.  I went home and at 6:00 pm my body went into the worst pain with all my bones aching violently.  I started to shake all over and I could not walk do to the shaking.  After an hour I could not get air in my lungs it was like they were collapsing.  Then my heart started racing and then it slowed and was irregular.  Then my brain started to hurt it was a weird felling [sic] and the headache was severe.  My daughter wanted to take me to the emergency room but I got in bed with 4 covers and she turned the heat up and I fell asleep until 11:00 pm.  I threw up 7 times and then I was coughing

---

[5] As respondent stressed in questioning upon cross examination, the vaccine administration record indicates the vaccine was administered by a pharmacist.  (Ex. 1, pp.1, 6; Tr. 67-69.)

[6] One reason for holding the fact hearing in this case was the undersigned's concern that Ms. Parker's signed, written statement abruptly switched from describing the course of petitioner's post-vaccination reaction in the third person (as would be appropriate) to the first person, raising a credibility issue.  (Ex. 5; ECF No. 50 (Rule 5 Order).)

and could not stop.  It was like I was going to cough up my lungs.  I took a triple dose of cough medicine and it stopped.  I thought I was going to die that night.  I read on the info that Hy VEE gave me that it is inactive serum and you can't get the flu.  I got all the signs of the flu in a compressed amount of time.  I was fine the next day.  I just wanted you to know that I will never take a flu shot again.  I don't understand why a person over 65 must take the 4 times the serum shot when I am 5 feet 1 inch tall and 135 pounds.  Why would a 6 foot man weighing 250 pounds take the same amount?  It stands to reason I did not need that amount of serum.  You don't have to respond to me.  This was just for your info and maybe put in my file.  Thank You for listening.

(*Id.*)

During the hearing, petitioner was asked whether this description is accurate.  (Tr. 19-20.)  She testified "Yes.  This is, because, you know, sometimes it's hard to remember exactly everything from back then, but this is what I said.  This is it."  (*Id.* at 20.)  Petitioner testified that, by the morning following her vaccination (and therefore by the time she wrote the e-mail to her physician), all of her symptoms had resolved except her alleged shoulder pain, which she testified was "still very painful" and "what hurt the most."  (*Id.* at 17.)  However, regarding her shoulder pain, petitioner testified that "I didn't think it was that important to what I wanted to tell him about my reaction to the shot he told me to get.  And that to me was secondary when I was writing him this."  (*Id.* at 23.)  Based on the description in petitioner's e-mail, the physician responded that "[i]t does sound like you had a reaction to the flu," which he characterized as "severe" and therefore recommended petitioner not receive the vaccine again in the future.[7]  (Ex. 2, p. 1.)

About two weeks later, petitioner presented to her primary care provider in person on January 29, 2020.  (Ex. 12, pp. 96-99.)  The recorded history was as follows:

---

[7] Significant attention was paid during the hearing to the fact that, despite stating that she believed she was going to die, petitioner was not actually taken to the emergency department on the night of January 14, 2020.  (*E.g.*, Tr. 129-32.)  In that regard, petitioner's daughter, Ms. Parker, who was with her at the time, testified that, despite being "terrified," she knew the situation was not life-threatening and opted not to seek medical attention because her mother has fear and anxiety regarding medical encounters.  (*Id.* at 129-32, 134-35.)  It was otherwise noted during the hearing that petitioner has a history of panic attacks and that she took Xanax, which is prescribed for her anxiety, after her symptoms began.  (*Id.* at 15, 17, 77, 112.)  In that regard, petitioner testified that she never received any specific diagnosis for her constellation of symptoms.  (*Id.* at 17.)  During the follow up encounter discussed below, her primary care provider noted petitioner's assessed vaccine reaction to have been nonallergic.  (Ex. 12, p. 97.)  On this record, however, there is not sufficient evidence to suggest petitioner suffered a panic attack rather than an adverse reaction to the vaccination, albeit nonallergic, as initially assessed by the treating physician.  Although the initial assessment was made without the benefit of a physical exam, the primary care provider did have a longstanding treatment history with petitioner, including for her anxiety and depression.  (Tr. 8, 57, 137.)

> Patient is here for an acute issue today.  She had a flu shot on January 14.
> It is important note this is only her second flu shot ever.  She did get 1 in
> 2015.  Within an hour of getting that shot she had what sounds like a fairly
> nonallergic significant reaction to the shot.  She had nausea and vomiting
> and threw up about 7 times.  She had fevers chills and sweats and what
> sounds to be rigors.  She had some difficulties with breathing and coughing.
> She had unusual sensations in the right chest that moved to the left chest.
> This lasted the entire night.  The next morning she felt better and did not
> have a fever after that.  She started eating again.  The only lasting thing is
> that she feels more palpitations and is worried that her heart and lungs are
> permanently damaged.  She feels like her heart skips a beat.  She has no
> cough or shortness of breath.  She denies any PND or orthopnea.  She
> sometimes will get numbness and tingling in the feet as well as at the end
> of the day have swelling of the feet.  She has not had precipitous weight
> gain.  She never wants to have a flu shot again.

(*Id.* at 97.)  The physician recorded his plan as "reassurance," noting that petitioner had no evidence of either heart or lung damage, including an absence of premature ventricular contractions on EKG and no signs of heart failure.  (*Id.* at 99.)  Although he was willing to mark the flu vaccine as an allergy in petitioner's record, he noted that he did not believe any further work up was needed and remarked that "I do not think there is anything to do now, I think she is much better.  She agrees." (*Id.*)  The record of this encounter includes a physical exam of petitioner's extremities; however, there is no explicit notation regarding petitioner's upper extremities.  (*Id.* at 98.)

Petitioner did not challenge the history recorded with the January 29, 2020 encounter.  (Tr. 24-25, 81.)  She testified that her shoulder was hurting at the time of this encounter (*Id.* at 24); however, she could not recall whether she told her physician about her alleged shoulder pain at this encounter and could not recall if her shoulder was examined (*Id.* at 24, 88-89).  Petitioner rationalized that she did not initially report her shoulder pain to her physician, because she understood it to be a result of the poor manner of administration and still felt it would go away.  (*Id.* at 23, 25, 81-82.)  Petitioner could not recall at what point in time she ultimately became concerned that her shoulder pain was persisting.  (*Id.* at 30.)  Yet, she testified on cross-examination that she knew what she was experiencing was not normal post-vaccination arm soreness.  (*Id.* at 82.)  In fact, petitioner testified that at the beginning, her pain was a nine on a ten-point scale.  (*Id.* at 38.)  In that regard, petitioner testified that she returned to the pharmacy to complain about her experience (which aspect is not clear) after only about three to four days.  (*Id.* at 40-43, 96-98.)  As a result of her effort, she learned about the vaccine injury program within about a week and a half of her vaccination.  (*Id.* at 98.)

Petitioner did not seek medical care again until about four months later, on May 8, 2020, when she presented for a virtual visit while quarantining herself due to Covid-19.  (Ex. 12, pp. 109-14.)  During the hearing, she confirmed the encounter was via video conference.  (Tr. 26.)  The progress note indicates:

She continues to have pain numbness and tingling in her right shoulder after a flu shot that was given in mid January. She had this done at Hy Vee and really had a reaction to it it sounds like. She has limited range of motion of her shoulder. She has no redness swelling or heat down the arm but she does have a local spot laterally on the shoulder where the injection was given. She tells me that the needle was bigger than usual that was used. She does have numbness and tingling down to the mid forearm. She otherwise feels okay systemically. No fevers chills or sweats. Appetite has been fair. She is anxious because of the quarantine for COVID-19 that she has been doing. She still smoking some. She does not want to come down to the hospital or have any testing at this point in time, just mostly wants reassurance. She also wants to know what she can do. Her pain is better with Tylenol and rest. She thinks it is worse recently because she has been trying to clean out her garage. Doing things that maybe she should not do.

(Ex. 12, p. 110.) Although this record seemingly indicates the encounter may have been prompted by recent pain related to cleaning out her garage, petitioner sought during the hearing to minimize the exertion involved in cleaning her garage, initially suggesting that she had only done some sweeping (Tr. 27); however, she ultimately noted that she did do at least some minimal lifting (*Id.* at 28-29). Petitioner testified that the history she provided at this May 8, 2020 encounter is correct. (*Id.* at 25-26.)

The notation for physical exam of petitioner's extremities notes "[n]o clubbing or cyanosis and no edema. She does have limited range of motion with shoulder abduction a little less than 90 degrees. No visible abnormalities of the shoulder on exam otherwise. No redness heat or swelling." (Ex. 12, p. 111.) The record does not explain how range of motion was assessed given the virtual format. (*See id.*) During the hearing, petitioner testified that the physician "asked me several questions. Raise your arm. Where does it start hurting? And that's what I did. (Tr. 31.) She said they did "like two or three" maneuvers. (*Id.* at 32.) The neurologic exam noted "[h]er strength appears normal in the upper extremities bilaterally and sensation seems to be normal to light touch in the fingertips," though, again, the manner in which this was determined is not indicated. (Ex. 12, p. 111.) Petitioner was assessed as having "[p]ossible shoulder injury related to vaccine administration." (*Id.*) Specifically, the physician remarked "I certainly told her that this is possible. I also worry about rotator cuff pathology." (*Id.* at 112.) However, petitioner did not want to pursue further testing at that time and conservative treatment, including Tylenol, ice, heat, and rest, were therefore recommended. (*Id.*) It was noted that "other options would involve coming here and doing a complete shoulder exam and may be [sic] x-rays versus EMG/NCS since there is some neuropathic flavor to her injury or even just a trial of gabapentin." (*Id.*) Petitioner was instructed to follow up in a month. (*Id.*)

Petitioner did not return for care until October 9, 2020, when she presented for an annual wellness exam. (Ex. 3, pp. 7-12.) It was noted that overall petitioner was "getting along fairly well." (*Id.* at 8.) However, she reported that she "continues to have mild numbness and pain in the right arm after receiving flu shot last winter. This is

slowly getting better." (*Id.*)  Otherwise, petitioner's shoulder was not discussed.  Physical exam of petitioner's extremities noted only the absence of clubbing, cyanosis, and edema.  (*Id.* at 10.)   No further evaluation of petitioner's alleged shoulder injury is in evidence.  Petitioner testified that she still experiences occasional numbness and tingling all the way down her arm.  (Tr. 94-95.)  However, she confirmed that she has not seen a neurologist for this complaint.  (*Id.* at 95.)

Petitioner's expert, Dr. Natanzi,[8] opined that petitioner "described having severe systemic reactions to and side effects of flu, which, in my opinion, more likely than not also included a shoulder condition." (Ex. 17, p. 3.)  Dr. Natanzi noted four reasons for this conclusion: (1) no other intervening event explains petitioner's reported shoulder pain; (2) it is common for patients to highlight only the most severe symptoms when presenting with multiple symptoms occurring simultaneously; (3) the medical records consistently attribute petitioner's shoulder dysfunction to her flu vaccine whenever it is mentioned; and (4) petitioner's personal statements recall severe pain immediately after vaccination.  (*Id.*)  In his conclusion, Dr. Natanzi stressed that "[t]his report is based on [petitioner's] recollection of events that are presumed to be accurate and have been taken at face value."  (*Id.* at 5.)

Based on his assumption of immediate post-vaccination shoulder pain, Dr. Natanzi opined that petitioner suffered a SIRVA.  (Ex. 17, p. 3.)  Dr. Natanzi acknowledged that petitioner's medical evaluations were limited and that she had no orthopedic in-person examination and no MRI.  (*Id.*)  However, he noted that this was likely due to pandemic-related restrictions and therefore, one should rely more heavily on clinical cues and subjective complaints.  (*Id.*)  Specifically, based on the May 8, 2020 finding of a greater than 50% reduction in range of motion, Dr. Natanzi endorsed Dr. Holm's suspicion of either a SIRVA or rotator cuff pathology.  (*Id.* at 3-4.)  In that regard, petitioner did testify that, because of her age, she "went into total panic and fear" regarding the pandemic, which caused her to be hesitant to seek care.  (Tr. 49.)

Dr. Natanzi acknowledged that petitioner's symptoms of numbness and tingling extending to her forearm "are not readily or commonly attributed to shoulder pathologies," but suggested that such symptoms can result from trigger points within the rotator cuff.  (Ex. 17, p. 4 (citing S. Atanasoff et al., *Shoulder Injury Related to Vaccine Administration (SIRVA)*, 28 VACCINE 8049 (2010) (Ex. 19); Gokcan Okur & Kimberly A. Chaney, *Magnetic Resonance Imaging of Abnormal Shoulder Influenza Vaccination*, 43 SKELETAL RADIOLOGY 1325 (2014) (Ex. 27)).)  Thus, because he opined that petitioner

---

[8] Dr. Natanzi received his Doctor of Osteopathy in 2012 from Western University of Health Sciences.  (Ex. 18, p. 2.)  He completed a traditional rotating internship at Downey Regional Medical Center in Downey, California in 2013.  (*Id.*)  Dr. Natanzi went on to complete his residency in physical medicine and rehabilitation at the University of California, Irvine in 2016, serving as chief resident in his final year.  (*Id.* at 1.)  Thereafter, he trained at Bodor Clinic in Napa, California, in 2017.  (*Id.*; Ex. 17, p. 1.)  Dr. Natanzi is board-certified in physical medicine and rehabilitation and pain management, and he maintains his license to practice medicine in California.  (Ex. 18, pp. 1, 4.)  Currently, he serves as a staff physician at VA Long Beach Healthcare System and is the founder of the Regenerative Sports and Spine Institute in Sherman Oaks, California.  (Ex. 17, p. 1; Ex. 18, p. 1.)  In his current practice, Dr. Natanzi almost exclusively treats patients with musculoskeletal issues.  (Ex. 17, p. 1.)

experienced injection-related rotator cuff and bursal injuries, he is willing to attribute petitioner's seeming neurologic symptoms to her alleged SIRVA. (*Id.*) Dr. Natanzi's opinion does not clearly, but could arguably, encompass an opinion with respect to causation-in-fact; however, any such opinion is based on the same temporal relationship upon which he relied in opining that a Table SIRVA was present. (*Id.* at 3-5.)

## IV.    Discussion

### a.    SIRVA QAI (1) – No history of pain, inflammation or dysfunction of the affected shoulder

The first SIRVA criterion requires that there be no relevant prior history of shoulder concerns that could explain the post-vaccination symptoms. In this case, there has been no suggestion that petitioner had any such history. (*See* ECF No. 68, p. 11.) Nor does my own review of the record evidence suggest petitioner's prior medical history includes any relevant conditions or symptoms affecting her right shoulder.

### b.    SIRVA QAI (2) – Pain occurs within the specified time-frame (*i.e.* 48 hours)

The second SIRVA criterion requires that the petitioner experience an onset of shoulder pain within 48 hours of the vaccination at issue. This is the most thoroughly contested point in this case.

Petitioner argues that she has demonstrated that the onset of her shoulder pain occurred within 48 hours of her vaccination. (ECF No. 67, pp. 2-3, 10.) She relies primarily on her own testimonial statements, which she argues are corroborated by her daughter's testimony. (*Id.* at 2-3, 5, 10.) She disagrees with respondent's characterization of the testimony offered in this case. (ECF No. 69, pp. 6-9.) She also seems to suggest that her medical records should be viewed as supporting her claim, stressing that her e-mail to her doctor and initial treatment record from January 29, 2020 broadly support the fact of a significant vaccine reaction and that her later May 8, 2020 encounter more explicitly identifies her shoulder pain as a part of that condition. (ECF No. 67, p. 3 (discussing Ex. 2, p. 1; Ex. 12, pp. 97, 99, 110).) She notes in particular that the May 8, 2020 record documents "a local spot laterally on the shoulder" as the site of injection. (*Id.* at 3, 7, 10 (citing Ex. 12, p. 110).) She also explains that she did not initially report her shoulder pain because she understood it to be due to a bad administration and expected the pain to persist for some time. (*Id.* at 6.) Otherwise, petitioner stresses that the limitations of her medical evaluations, and her delay in seeking treatment specifically for her shoulder, are explained by her agoraphobia and the Covid-19 pandemic. (*Id.* at 3-4, 6-7.)

Respondent argues, however, that petitioner and her daughter did not provide the type of compelling testimonial evidence that could have overcome her contemporaneous medical records, suggesting the testimony was susceptible to

exaggeration and credibility concerns.  (ECF No. 68, p. 13.)  Respondent notes a number of inconsistencies between petitioner's account and her daughter's account.  (*Id.* at 13-14.)  Respondent stresses that the contemporaneous medical records show that petitioner not only waited four months to report her alleged shoulder pain, but that she also failed to mention it at in-person medical encounters occurring in the meantime.  (*Id.* at 14 (citing *Stryski v. Sec'y of Health & Human Servs.*, No. 20-1177V, 2022 WL 17820775 (Fed. Cl. Spec. Mstr. Oct. 17, 2022); *Bulman v. Sec'y of Health & Human Servs.*, No. 19-1217V, 2021 WL 4165349 (Fed. Cl. Spec. Mstr. Aug. 12, 2021)).)

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records.  § 300aa-11(c)(2).  The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions."  § 300aa-13(b)(1)(A)-(B).  However, the special master is then required to weigh all of the evidence presented.  *See Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence).  The special master is obligated to consider and compare the medical records, testimony, and all other "relevant and reliable evidence" contained in the record.  *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 204 (2013) (quoting Vaccine Rule 8) (citing § 300aa-12(d)(3)), *aff'd sub nom.*, *LaLonde v. Sec'y of Health & Human Servs.*, 746 F.3d 1334 (Fed. Cir. 2014); *see also Burns*, 3 F.3d at 416-17.  Thus, for example, the Vaccine Act explicitly instructs that a special master may find the time period for the first symptom or manifestation of onset required for a Table Injury is satisfied "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period."  § 300aa-13(b)(2).  However, such a finding must in all events be supported by preponderant evidence.  *Id.*

The Federal Circuit has held that contemporaneous medical records are ordinarily to be given significant weight due to the fact that "[t]he records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium.  These records are also generally contemporaneous to the medical events."  *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).  Thus, where medical records are clear, consistent, and complete, they should be afforded substantial weight.  *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  However, this rule is not absolute.  There is no presumption that medical records are accurate or complete as to all of a patient's physical conditions.  *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).  Afterall, "medical records are only as accurate as the person providing the information."  *Parcells v. Sec'y of Health & Human Servs.*, No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006).

"[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. denied*, *Murphy v. Sullivan*, 506 U.S. 974 (1992). When witness testimony is offered to overcome the weight generally afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent[,] and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).  Further, a special master must consider the credibility of the individual offering the testimony.  *See Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

In this case, I find that the contemporaneous medical records, namely petitioner's e-mail to her primary care provider of January 16, 2020 (Ex. 2), and her in-person follow up encounter of January 29, 2020 (Ex. 12, pp. 96-99), which do not identify the presence of any arm or shoulder pain, are due substantial weight, greater weight than can be placed on the later medical records.  Moreover, I do not find the testimonial evidence credible enough to outweigh these contemporaneous records.  There are several reasons for these conclusions.

As a threshold matter, there is no dispute that the contemporaneous records are accurate.  Petitioner testified of her initial January 16, 2020 e-mail to her physician "this is what I said.  This is it." (Tr. 20.)  Indeed, petitioner specifically testified that it was the best available recollection of what had occurred.  (*Id.* (stating "sometimes it's hard to remember exactly everything from back then, but this is what I said").)  Moreover, I place still further weight on this initial e-mail because it represents petitioner's own firsthand account.  *Demitor v. Sec'y of Health & Human Servs.*, No. 17-564V, 2019 WL 5688822, at *10 (Fed. Cl. Spec. Mstr. Oct. 9, 2019) (finding significance in a history derived from petitioner's own handwritten intake form, meaning "it cannot be said to reflect any transcription mistake or miscommunication on the part of the [provider] or his office.  Nor can petitioner reasonably suggest that she was incompletely or incorrectly paraphrased.")  Petitioner likewise did not contest that the history she provided at her in-person follow up on January 29, 2020 was accurate.  (Tr. 24-25, 81.)  Moreover, she did not at any time assert that, despite these records, she had reported shoulder pain to her physician.  Instead, she confirmed that she did not include such a report in her initial e-mail and could not recall whether she raised the issue at her January 29, 2020 encounter.  (*Id.* at 23-25, 87-89.)

Furthermore, the contemporaneous records represent detailed, consistent, and seemingly complete, accounts of petitioner's initial vaccine reaction, which include no report of shoulder pain.  Petitioner's initial e-mail account from very shortly after her reaction was an extensive description of her experience, including hour by hour accounting of her vaccination, return home, and onset of symptoms, even indicating the precise number of times petitioner vomited.  (Ex. 2, p. 1.)  She followed up with an in-person checkup just two weeks later.  (Ex. 12, pp. 96-99.)  And, notably, while there

was no explicitly documented upper extremity exam, the record does confirm that a physical exam of the lower extremities was conducted that correlated with the history that had been provided. (*Compare id.* at 97 (history noting numbness, tingling, and swelling of the feet), *with id.* at 98 (physical exam of the extremities examining lower extremities up to the knee and noting a lack of clubbing, cyanosis, or edema).) Moreover, the purpose of the encounter was to discuss petitioner's concern that she had ongoing "permanent" damage from her vaccine reaction. (*Id.* at 97.) However, the record ultimately explains "I do not think there is anything to do now, I think she is much better. She agrees." (*Id.* at 99.) Thus, these records are not merely silent as to the presence of shoulder pain. The January 29, 2020 in-person encounter and physical exam contradict the notion of such a complaint given that petitioner had a holistic in-person examination by a primary care provider targeted toward assessing post-vaccination sequela she had reported and the resulting record confirms that both she and her treating physician agreed her condition was resolved and that no further work-up was required. (*Id.*) Moreover, in testimony, petitioner agreed broadly that the January 29, 2020 exam included her extremities. (Tr. 81.)

I have also considered that petitioner's later encounter record of May 8, 2020 includes a history that nonetheless attributed right shoulder pain to "a flu shot that was given in mid January." (Ex. 12, p. 110.) As with the prior records, petitioner testified that this record is accurate. (Tr. 25-26.) However, this record is further removed from the events at issue and, as a general matter, later histories are often given less weight. *See, e.g.*, *R.K. v. Sec'y of Health & Human Servs.*, No. 03-0632V, 2015 WL 10936124, at *76 (Fed. Cl. Spec. Mstr. Sept. 28, 2015) (holding that more remote histories of illness do not have sufficient indicia of reliability to be credited over conflicting contemporaneous medical records and earlier reported histories), *mot. for rev. denied*, 125 Fed Cl. 57 (2016), *aff'd*, 671 F. App'x 792 (Fed. Cir. 2016); *see also Vergara v. Sec'y of Health & Human Servs.*, No. 08-882V, 2014 WL 2795491, *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those *recounted in later medical histories*, affidavits, or trial testimony" (emphasis added).). Additionally, the record strongly suggests that the encounter was prompted by a recent change in petitioner's condition, which clouds the purported association to her prior vaccination. Specifically, it noted of petitioner's reported arm and shoulder complaints that "[s]he thinks it is worse recently because she has been trying to clean out her garage." (Ex. 12, p. 110.) And, in any event, the history is no more specific than to indicate that petitioner experienced shoulder pain some time "after" her vaccine and that petitioner associated the pain with the vaccination. (*Id.*) Given the existence of the January 16, 2020 and January 29, 2020 records, and especially the fact that the January 29 record reflects an in-person examination, this use of the term "after" is inadequate to evidence an onset of shoulder pain occurring specifically within 48 hours of vaccination. Petitioner argues, in effect, that the earlier records of January 16 and 29 should be read in harmony with the later May 8, 2020 record, because, although they do not explicitly mention shoulder pain, they confirm her initial adverse reaction to the vaccine. (*See* ECF No. 67, pp. 2-3.) However, this begs the very question of whether the vaccine reaction included any shoulder pain. Notably, not even petitioner considers the shoulder pain to have been a

part of the systemic adverse reaction she had previously reported.  Instead, she testified that she attributed the shoulder pain directly to the manner of injection.  (Tr. 23, 25, 69-70, 81-82.)

Additionally, the testimony offered in this case is not credible enough to outweigh the contemporaneous medical records.  In particular, there are internal tensions within petitioner's own stated rationale for her actions.  For example, on the one hand, petitioner testified that her delay in seeking treatment should be attributed to her agoraphobia as well as the Covid-19 pandemic, which caused her to hesitate to seek care for her shoulder.  (Tr. 29-30, 49.)  On the other hand, petitioner testified that she knew immediately that her alleged shoulder pain was *not* normal post-vaccination arm soreness (*Id.* at 82.) and she did, in fact, subsequently present for care of her vaccine reaction on January 29, 2020 (Ex. 12, pp. 96-99).  Thus, the fact that petitioner did not report her alleged arm and shoulder pain on January 29 at her already-occurring in-person appointment cannot be explained by either her agoraphobia or any misperception that her pain was mere post-vaccination soreness rather than an actual injury.

Petitioner further testified that she did not include her shoulder pain in her initial e-mail to her physician because it was of secondary importance.  (Tr. 23.)  In that regard, Dr. Natanzi similarly endorsed the notion that patients report only the most severe symptoms.  (Ex. 17, p. 3.)  However, petitioner also testified, in effect, that at the time she wrote the e-mail, her shoulder pain was her only remaining symptom and was "still very painful" and "what hurt the most."  (Tr. 17.)  She also testified that the injury was extremely painful, noting that she had "never had any pain like this in my life."  (*Id.* at 11.)  She indicated that her shoulder pain was a nine on a ten-point pain scale.  (*Id.* at 38.)  Moreover, although she was clear in testifying that her alleged shoulder pain was not a part of the systemic reaction she suffered (*Id.* at 23, 25), she did otherwise testify that she believed the pain resulted from a deliberate attempt to injure her (*Id.* at 63, 69-70).  Thus, even accepting that petitioner could have had a narrower purpose in writing the January 16, 2020 e-mail, it is still very difficult to square petitioner's perception that she had been injured (deliberately so), resulting in the worst pain of her life, with her complete inaction in terms of seeking medical treatment for that injury.  To the extent petitioner testified that she initially felt the injury would resolve on its own (*Id.* at 25), she was unable to recall when she became concerned that the pain was persisting (*Id.* at 30).[9]

---

[9] Additionally, without doubting that petitioner's vaccination was a negative experience for her, I find that petitioner's vivid account of her vaccination experience is not entirely persuasive.  Notably, petitioner testified that she has fear and anxiety regarding medical encounters generally and vaccine administration in particular.  (*E.g.*, Tr. 10.)  Although she denied that her fear and anxiety colored her impression of her vaccine administration (*Id.* at 84-85), she did at a minimum acknowledge that her perception of the injection needle was likely exaggerated (*Id.* at 84).  Moreover, while she initially described herself as crying as a result of the injection, she conceded on cross-examination that she had not actually cried.  (*Compare id.* at 11-12, *with id.* at 70.)  Thus, it is difficult to take this account entirely at face value.  Certain aspects of petitioner's account, while not refuted on this record, are difficult to accept, without corroboration, as recollections likely to be accurate, including her assertion that the vaccine administrator was a nursing student, that the administrator "lost it," that the administrator intentionally harmed her, that

Finally, I have considered that both petitioner and her daughter testified that petitioner came home after this vaccination encounter and immediately reported significant shoulder pain prior to the onset of her systemic vaccine reaction.  (Tr. 14, 111.)  However, even setting aside the inconsistencies argued by respondent, I remain concerned that Ms. Parker's original written account of the events of January 14, 2020, which was in itself less clear as to the presence of shoulder pain versus injection site swelling, was drafted in the first instance by petitioner, a point that was confirmed by both witnesses during the hearing.  (*Id.* at 102-03, 119-21, 124-26 (discussing Ex. 5).)  Moreover, although neither witness could recall precisely when the document was created (*Id.* at 101-03, 120-21), Ms. Parker confirmed that it was for purposes of litigation relative to petitioner's alleged shoulder injury (*Id.* at 121, 128-29).  Thus, to the extent Ms. Parker's testimony follows from the substance of the prior written statement, I am unable to discern the extent to which it reflects a true independent recollection of events.  To be clear, this is not to doubt that petitioner suffered some form of systemic reaction after she got home.  That is corroborated by contemporaneous documentation in the form of petitioner's January 16, 2020 e-mail.  (Ex. 2.)  The only issue is whether Ms. Parker's testimony corroborates specifically that petitioner was also experiencing shoulder pain at that time, which was not contemporaneously recorded.  As noted above, petitioner testified that the January 16, 2020 e-mail, which did not discuss shoulder pain, and which predated any of the other testimonial statements, written or oral, was the best available recollection of events.  (Tr. 20 (stating "sometimes it's hard to remember exactly everything from back then, but this is what I said").)

For all these reasons, there is not preponderant evidence that petitioner suffered an onset of right shoulder pain within 48 hours of the administration of the subject vaccination.

c. <u>SIRVA QAI (3) – Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered</u>

The third SIRVA criterion requires that the post-vaccination pain and reduced range of motion be limited to the affected shoulder.  This requirement encompasses an affirmative showing that the petitioner's presentation included a reduction in range of motion.  *Bolick v. Sec'y of Health & Human Servs.*, No. 20-893V, 2023 WL 8187307, at *6-8 (Fed. Cl. Spec. Mstr. Oct. 19, 2023).  Otherwise, as I have previously explained at greater length in a prior decision, "the gravamen of this requirement is to guard against compensating claims involving patterns of pain or reduced range of motion indicative of a contributing etiology beyond the confines of a musculoskeletal injury to the affected shoulder."  *Grossmann v. Sec'y of Health & Human Servs.*, No. 18-00013V, 2022 WL 779666, at *15 (Fed. Cl. Spec. Mstr. Feb. 15, 2022) (citing *Werning v. Sec'y of Health & Human Servs.*, No. 18-0267V, 2020 WL 5051154, at *10 (Fed. Cl. Spec. Mstr. July 27, 2020)).

---

the vaccine administrator forcefully rolled up her sleeve, and that she received the vaccination standing up.  (*Id.* at 11, 62-65, 69-70.)

Although petitioner never had an in-person examination of her range of motion in her shoulder, respondent does not challenge the presence of reduced range of motion. (ECF No. 68, p. 18.)  Instead, he argues that the evidence, particularly petitioner's testimony, indicates that petitioner had pain, numbness, and tingling, extending all the way down her forearm, which he argues is incompatible with SIRVA.  (*Id.* (citing Tr. 95).)  Respondent cites two cases to support this argument.  (*Id.* (citing *Handley v. Sec'y of Health & Human Servs.*, No. 21-1194V, 2024 WL 1328709 (Fed. Cl. Spec. Mstr. Feb. 21, 2024); *Blevins v. Sec'y of Health & Human Servs.*, No. 21-0385V, 2024 WL 1009562 (Fed. Cl. Spec. Mstr. Jan. 12, 2024).)  Petitioner argues that the cases cited by respondent are distinguishable based on the extent of the neck and back pain involved in those cases.  (ECF No. 69, pp. 9-10.)  She argues that she "has not complained of pain outside her right shoulder – it has always been limited to her right shoulder.  While Petitioner testified that she has some numbness radiating down her right arm at times, such numbness is associated with her right shoulder injury."  (*Id.* at 10.)

Petitioner is not persuasive in contending that only her numbness, and not her reported pain, extended beyond the shoulder.  While it is true that the history she provided on May 8, 2020 does not clearly identify pain (as opposed to numbness and tingling) extending beyond the shoulder (Ex. 12, p. 110), her subsequent encounter record several months later specifically noted that she "continues to have mild numbness and pain in the right arm after receiving flu shot last winter" (Ex. 3, p. 8; *see also* Tr. 33-34 (endorsing the accuracy of the notation); Ex. 11, p. 3 (stating "[m]y right arm is causing me pain")).  In that regard, the affidavit petitioner submitted with her petition states "[s]ince receiving the vaccine, I have experienced significant pain, weakness, numbness, and limited range of motion in my right shoulder *and arm.*"  (Ex. 7, ¶ 5 (emphasis added).)

Nonetheless, as noted above, the key question is whether the pattern of pain and reduced range of motion is indicative of an etiology beyond the shoulder itself.  *Grossman*, 2022 WL 779666, at *15.  Here, petitioner's treating physician felt that a SIRVA was only one "possible" explanation for her symptoms.  (Ex. 12, pp. 111-12.)  He otherwise remained concerned, especially in the absence of a complete in-person shoulder exam, that petitioner's reported symptoms had a "neuropathic flavor."  (*Id.* at 112.)  Although petitioner's expert, Dr. Natanzi, was more willing to conclude that these symptoms were sequela of her alleged SIRVA, he likewise acknowledged that they "are not readily or commonly attributed to shoulder pathologies."  (Ex. 17, pp. 3-4.)

Additionally, although respondent did not raise the issue, I remain concerned that petitioner's alleged reduced range of motion is not preponderantly demonstrated.  Of course, the fact that petitioner did not undergo an in-person evaluation on May 8, 2020 is readily explained by the Covid-19 pandemic.  I stress that I do not fault petitioner for resorting to a telehealth encounter and that I do give some weight to the remote findings that resulted from the May 8, 2020 encounter as evidence of her condition at the time.  However, especially given the other issues as to onset and symptoms beyond the

shoulder, I cannot overlook the treating physician's notation that "I told her other options would involve coming here and doing a complete shoulder exam and may be x-rays versus EMG/NCS since there is some neuropathic flavor to her injury . . . ." (Ex. 12, p. 112.) This evidences that petitioner's treating physician was not comfortable that the telehealth encounter was sufficient to diagnose her condition as a shoulder injury based on her reported symptoms and only a remote demonstration of reduced range of motion.

Prior decisions have explained that a petitioner's burden of proof under the third SIRVA criterion is to show "actual, demonstrated movement limitations" whereas "a reluctance to move one's arm or shoulder due to pain is not equivalent." *Petty v. Sec'y of Health & Human Servs.*, 19-1332V, 2024 WL 5381961, at *4 (Fed. Cl. Spec. Mstr. Sept. 24, 2024) (emphasis omitted); *see also McNally v. Sec'y of Health & Human Servs.*, No. 20-1763V, 2024 WL 4024429, at *4 (Fed. Cl. Spec. Mstr. July 31, 2024) (explaining the petitioner's report of reduced range of motion "was not corroborated by any actual exam. Indeed, no ROM limits were demonstrated at any of petitioner's in-person visits with Dr. Wetters. Otherwise, Petitioner only displayed pain with shoulder movement." (emphasis omitted)). Here, although petitioner testified that she performed two to three different maneuvers for her physician via video, she explained that he "asked me several questions. Raise your arm. Where does it start hurting? And that's what I did." (Tr. 31-32.) Thus, by petitioner's own account, her exam would only have ascertained pain with movement. No other explicit range of motion determination is included in any of the medical records.

For all these reasons, there is not preponderant evidence that petitioner suffered pain and reduced range of motion limited to the affected shoulder.

### d. SIRVA QAI (4) – No other condition or abnormality is present that would explain the patient's symptoms.

The fourth SIRVA criterion requires that "[n]o other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)." 42 C.F.R. § 100.3(c)(10)(iv). This element of petitioner's showing "requires consideration of a petitioner's medical condition as a whole." *Record v. Sec'y of Health & Human Servs.*, 175 Fed. Cl. 673, 680 (2025). While the "other condition or abnormality" at issue must qualify as an explanation for the petitioner's symptoms, it "need not be a better or more likely explanation." *French v. Sec'y of Health & Human Servs.*, No. 20-0862V, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sept. 27, 2023). Indeed, a petitioner may fail to meet the fourth SIRVA criterion even where there is clinical evidence of an alternative condition that falls short of a definitive diagnosis. *Durham v. Sec'y of Health & Human Servs.*, No. 17-1899V, 2023 WL 3196229, at *13-14 (Fed. Cl. Spec. Mstr. May 2, 2023) (noting that the regulation cites "clinical evidence of" various conditions). Ultimately, where the presence of another condition is apparent, petitioner bears the burden of proving that the condition nonetheless "would not explain" her symptoms. *Id.* at *14.

Neither party paid significant attention to the fourth SIRVA criterion. However, the conclusion relative to this criterion necessarily follows from the analyses in the two preceding sections. Petitioner does not have any other definitively diagnosed condition that would explain her symptoms. However, as discussed in the preceding section, she consistently reported her shoulder pain as occurring in the context of pain, numbness, and tingling, running down her arm. Her primary care provider felt that these symptoms were "neuropathic in flavor" and recommended a follow up EMG/NCS. (Ex. 12, p. 112.) Despite this, and despite acknowledging that petitioner's symptoms "are not readily or commonly attributed to shoulder pathologies," Dr. Natanzi was willing to opine that petitioner's own symptoms were sequela of her SIRVA. (Ex. 17, pp. 3-4.) However, this opinion was based on a close temporal relationship between vaccination and pain onset as well as Dr. Natanzi's accepting of petitioner's May 8, 2020 telehealth appointment as confirmation of a rotator cuff and bursal pathology. (*Id.*) In light of the analysis in the two preceding sections, neither of these assumptions is preponderantly supported. Accordingly, petitioner does have "clinical evidence of" neuropathy that would potentially explain her symptoms, as was noted by her treating physician.

For all these reasons, there is not preponderant evidence that petitioner is free of any other condition or abnormality that would explain her symptoms.

e. Causation-in-fact

In her motion for a ruling on the written record, although she overwhelmingly focuses on asserting a Table SIRVA claim, petitioner also states that "[a]lternatively, if the Court believes this claim is more properly categorized as an 'Off Table' claim, Petitioner requests judgment in her favor for an 'Off Table' claim based on the same evidence outlined above." (ECF No. 67, p. 10.) Importantly, however, petitioner did not explain in her motion what injury she alleges to have been caused-in-fact by her vaccination. Nor did she plead any such injury in her petition.

Petitioner "must specify [her] vaccine-related injury and shoulder the burden of proof on causation." *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1346 (Fed. Cir. 2010). "Although the Vaccine Act does not require absolute precision, it does require the petitioner to establish an injury – the Act specifically creates a claim for compensation for 'vaccine-related injury or death.'" *Stillwell v. Sec'y of Health & Human Servs.*, 118 Fed. Cl. 47, 56 (2014) (emphasis omitted) (quoting 42 U.S.C. § 300aa-11(c)). In order to present an "injury" cognizable under the Vaccine Act, "[m]edical recognition of the injury claimed is critical" and petitioner must assert "more than just a symptom or manifestation of an unknown injury." *Broekelschen*, 618 F.3d at 1349. As explained above, due to the significant limitations in her medical evaluations, the nature of petitioner's right arm and shoulder complaints, and whether they are due to a musculoskeletal or neurologic cause, remains unclear. Even accepting that petitioner likely experienced some form of transient systemic adverse reaction to her vaccination, that condition does not satisfy the statutory severity requirement standing alone. The

symptoms resolved by the next day and petitioner did not experience inpatient hospitalization and surgical intervention as a result.

During the pendency of this case, petitioner was invited to explore whether she could link her later-reported shoulder symptoms to that initial constellation of systemic symptoms, but she did not succeed in doing so.  Instead, Dr. Natanzi sought to opine that petitioner's shoulder injury began at the same time as her constellation of systemic symptoms.  In so doing, Dr. Natanzi predicated his medical opinion on the assumption that petitioner's shoulder symptoms began within 48 hours of vaccination, which I have found is not preponderantly supported.  Therefore, his opinion is not credited.  *Burns*, 3 F.3d at 417 (holding that "[t]he special master concluded that the expert based his opinion on facts not substantiated by the record.  As a result, the special master properly rejected the testimony of petitioner's medical expert."); *Dobrydnev v. Sec'y of Health & Human Servs.*, 566 F. App'x 976, 982-83 (Fed. Cir. 2014) (holding that the special master was correct in noting that "[w]hen an expert assumes facts that are not supported by a preponderance of the evidence, a finder of fact may properly reject the expert's opinion" (alteration in original) (quoting *Dobrydneva v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2010 WL 8106881, at *9 n.12 (Fed. Cl. Spec. Mstr. Oct. 27, 2010), *rev'd*, 98 Fed. Cl. 190 (2011), *rev'd sub nom.*, *Dobrydnev v. Sec'y of Health & Human Servs.*, 566 F. App'x 976, 982-83 (Fed. Cir. 2014)) (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993))); *Bushnell v. Sec'y of Health & Human Servs.*, No. 02-1648V, 2015 WL 4099824, at *12 (Fed. Cl. Spec. Mstr. June 12, 2015) (finding that "because Dr. Marks' opinion is based on a false assumption regarding the onset of J.R.B.'s condition, and the incorrect assumption of a 'stepwise regression' after each vaccine administration, it should not be credited").

Petitioner's primary care physician likewise suggested petitioner may have a "possible" shoulder injury related to vaccine administration.  (Ex. 12, p. 111.)  However, this was, at best, a tentative conclusion, as it is apparent from the medical record that he had not ruled out a neurologic cause for petitioner's condition. (*Id.* at 112 (noting the lack of a complete physical exam and describing the reported injury as having a "neuropathic flavor").)  While I appreciate that petitioner has a strongly held view that her symptoms are related to her vaccination, it is she who bears the burden of proof and the Federal Circuit has explained that "[a]lthough probative, neither a mere showing of a proximate temporal relationship between vaccination and injury, nor a simplistic elimination of other potential causes of the injury suffices, without more, to meet the burden of showing actual causation."  *Althen*, 418 F.3d at 1278. Thus, "[a] treating physician's recognition of a temporal relationship does not advance the analysis of causation."  *Isaac v. Sec'y of Health and Human Servs.*, No. 08-601V, 2012 WL 3609993, at *26 (Fed. Cl. Spec. Mstr. July 30, 2012).  And, in any event, even if accepting the treater's impression as a clear diagnosis, it would still be based on the same close temporal relationship as assumed by Dr. Natanzi.

## V.      Conclusion

Petitioner clearly suffered and she does have my sympathy.  However, for all the reasons discussed above, there is not preponderant evidence of any compensable injury under the standards set by this program.  Therefore, pursuant to § 300aa-12(d)(3)(A) and Vaccine Rule 10, this decision concludes that petitioner is not entitled to an award of compensation.  Absent a timely motion for review, the Clerk is directed to enter judgment dismissing this case for insufficient proof in accordance with Vaccine Rule 11(a).


**IT IS SO ORDERED.**

**<u>s/Daniel T. Horner</u>**
Daniel T. Horner
Special Master
