# In the United States Court of Federal Claims

**NOT FOR PUBLICATION**

No. 21-567V
(Filed: March 24, 2026[*])

|  |  |
|---|---|
| **JULIE CAVANAUGH**, | ) |
|  | ) |
| *Petitioner*, | ) |
|  | ) |
| v. | ) |
|  | ) |
| **SECRETARY OF HEALTH AND HUMAN SERVICES**, | ) |
|  | ) |
| *Respondent*. | ) |
|  | ) |

*Zachary J. Hermsen*, Whitfield & Eddy, PLC, Des Moines, IA, for petitioner.  With him on the brief was *Bryn E. Hazelwonder*, Whitfield & Eddy, PLC, Des Moines, IA.

*Ryan A. Nelson*, Trial Attorney, Torts Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant.  With him on the brief were *Brett A. Shumate*, Assistant Attorney General; and *Jonathan D. Guynn*, Acting Director, *Heather L. Pearlman*, Deputy Director, and *Voris E. Johnson*, Assistant Director, Torts Branch, Civil Division, U.S. Department of Justice, Washington, DC.

## OPINION AND ORDER

***BONILLA, Judge***.

Petitioner Julie Cavanaugh seeks review of a decision of the Office of Special Masters (OSM) denying compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa-10 to 300aa-34.  Specifically, Ms. Cavanaugh challenges the OSM's finding that she failed to prove her shoulder pain began within the requisite timeframe following a flu shot.  In support, she contends that the special master erred in adopting "a new bright-line rule"

---

[*] In accordance with Rule 18(b) of the Vaccine Rules of the United States Court of Federal Claims, this opinion was initially filed under seal on March 9, 2026, to afford the parties the opportunity to propose redactions based upon privacy concerns.  No proposed redactions were submitted.

that impermissibly "heightened [her] burden of proof . . . ."[1]    ECF 72-1 at 5. The record presented belies Ms. Cavanaugh's argument.  Accordingly, her motion for review must be denied.

## BACKGROUND

Ms. Cavanaugh received a seasonal flu shot at a grocery store pharmacy on January 14, 2020.  During her testimony before the special master, Ms. Cavanaugh described an unpleasant vaccination experience attributed to a lack of professionalism and compassion exhibited by the administering nursing student, who reportedly "jabbed" Ms. Cavanaugh with the injection near the top of her right shoulder.[2]  A339.[3]  Describing the pain as immediate and "excruciating," A80, Ms. Cavanaugh assumed the needle penetrated a muscle or bone.  A339.  She left the grocery store with a swollen arm.

After returning home, Ms. Cavanaugh relayed the ordeal to her daughter. Ms. Cavanaugh then reportedly "started to shake violently and fell to the floor. [She] could not walk[;] every bone in [her] body was moving really fast[;] and [she] could not get up . . . ." A80.  Ms. Cavanaugh described the next events as follows:

> [My daughter] tried to hold me up so I could get to my bedroom. I told her I am having a bad allergic reaction to the shot. I was freezing and told her to get me blankets. I then felt the serum going into my lungs and I could not breathe. I told her I think I am going to die. I sat on my bed and [was] still shaking and put lots of blankets around me. . . . I told [my daughter] my heart is beating so fast it seemed like it is going to explode. She said she was going to her room to get ready to take me to the emergency room. . . . I took 3 Tylenol and 2 Xan[a]x.

*Id.*  Ms. Cavanaugh then either passed out or fell asleep and was unresponsive for about two hours.  She awoke for a brief period, "vomit[]ed . . . violently," and then slept through the night with her daughter at her side.  *Id.*  According to Ms. Cavanaugh, apart from her shoulder pain, her symptoms were gone by the following morning.

Ms. Cavanaugh first consulted a medical professional about her reaction to the flu shot two days post-vaccination.  In a January 16, 2020 email to her primary care physician under the subject line "Non-Urgent Medical Question," Ms. Cavanaugh

---

[1] As explained below, this matter was first assigned to the Chief Special Master and then transferred to another special master.  For clarity, generic references to the "special master" invoke the latter.

[2] Although there is some confusion in the record regarding whether the flu shot was administered in Ms. Cavanaugh's right or left shoulder, the special master accepted Ms. Cavanaugh's representation that she received the shot in her right shoulder.

[3] "A__" is a citation to the Bates-numbered appendix filed by Ms. Cavanaugh (ECF 72-2).

described her reaction to the flu shot in detail, remarking in the end that she "was fine the next day." A10. After informing her doctor that she "will never take a flu shot again," Ms. Cavanaugh closed her email as follows: "You don't have to respond to me. This was just for your info and maybe [to] put in my file. Thank You for listening."[4]  *Id.*  Notably absent from her email was any reference to shoulder pain—the only symptom that allegedly remained at the time.[5]

Her next consultation with a healthcare provider was an in-person visit to the same physician about two weeks later, on January 29, 2020. During this visit, Ms. Cavanaugh reported that "she [was] feel[ing] more palpitations and [wa]s worried that her heart and lungs [we]re permanently damaged" as a result of the flu shot. A182. Her doctor found "no sign of permanent heart or lung damage." A184. As for Ms. Cavanaugh's extremities, the doctor noted: "She sometimes will get numbness and tingling in the feet as well as at the end of the day have swelling of the feet." A182; *accord* A183 (documenting chronic numbness below left knee). The progress notes further report that Ms. Cavanaugh was "[i]n no acute distress." A183. Aside from providing Ms. Cavanaugh with "[r]eassurance" about her heart and lung health and recommending that she not get flu shots in the future given her "severe . . . reaction," the physician concluded that no testing or treatment was warranted. A184 ("I do not think there is anything to do now, I think she is much better. She agrees."). The record of this visit made no mention of shoulder pain.

Ms. Cavanaugh next met with her primary care physician about three months later, in the midst of the COVID-19 pandemic. During the May 8, 2020 telehealth appointment, Ms. Cavanaugh reported that "[s]he continue[d] to have pain[,] numbness[,] and tingling in her right shoulder after a flu shot that was given in mid[-]January." A195; *accord* A343. Ms. Cavanaugh reported that the sensations extended to her forearm and that, at the time of her appointment, "[s]he ha[d] limited range of motion of her shoulder." A195. Ms. Cavanaugh stated her symptoms had recently worsened due to "trying to clean out her garage" and generally "[d]oing things that maybe she should not do." *Id.* Notwithstanding the implication that her shoulder pain began sometime well before the appointment, this is the first mention of shoulder pain in Ms. Cavanaugh's medical records. Her physician assessed

_____

[4] Ms. Cavanaugh's doctor responded two hours later, agreeing that she should forgo future flu shots in light of the reaction she had described in her message. *Id.*

[5] During her testimony before the special master, Ms. Cavanaugh offered two explanations for her failure to mention her shoulder pain in the January 16, 2020 email. First, the main purpose of the email was to rebut her doctor's routine advice that she get a seasonal flu shot. A342 ("[My doctor is] always bugging me to get the shot, get the flu shots, get the flu shots. And I wanted to make sure he knew this is what happened when I got one."). This marked only the second time Ms. Cavanaugh recalled getting a flu shot—the first was five years earlier. According to Ms. Cavanaugh, any mention of the shoulder pain would have been "secondary" to that objective. A344. Second, she expected to experience some amount of shoulder pain in the days following the aggressive injection. The special master did not find this testimony persuasive.

"[p]ossible shoulder injury related to vaccine administration [(SIRVA)⁶]" but noted that he "also worr[ied] about rotator cuff pathology." A196–97. Citing the pandemic, Ms. Cavanaugh declined to undergo in-person testing or a thorough shoulder examination.

Five months later, on October 9, 2020, Ms. Cavanaugh saw her primary care physician for a "hypertension follow[-]up." A205. During the in-person visit, Ms. Cavanaugh reported that "[s]he continue[d] to have mild numbness and pain in the right arm after receiving [a] flu shot last winter. This is slowly getting better." A205. The medical record for this visit does not document any testing, examination, or treatment related to her upper extremities, nor does it mention SIRVA as a possible diagnosis.

Against this backdrop, Ms. Cavanaugh initiated this action on January 11, 2021. Because her petition alleges only a Table injury,⁷ the petition was initially assigned to the OSM's Special Processing Unit for resolution by the Chief Special Master. Three years later, the Chief Special Master reassigned the matter to another special master after concluding there were too many factual issues to warrant resolution in the Special Processing Unit. In the reassignment order, the Chief Special Master expressed doubts regarding the viability of Ms. Cavanaugh's SIRVA Table claim, suggesting that she might instead consider pursuing a *"SIRVA-like"* off-Table claim.⁸ ECF 43 at 4 (emphasis in original).

---

⁶ As defined in the Vaccine Injury Table, *see infra* note 7:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.).

42 C.F.R. § 100.3(c)(10).

⁷ The National Vaccine Injury Compensation Program, codified at 42 U.S.C. §§ 300aa-10 to 300aa-34, entitles people injured by certain enumerated vaccines to compensation. *See generally* 42 U.S.C. § 300aa-13. There are two categories of vaccine injuries: those listed in the Vaccine Injury Table ("Table injuries") and those not listed in the Vaccine Injury Table ("off-Table injuries"). *See generally* 42 C.F.R. § 100.3 (Vaccine Injury Table). For Table injuries, causation is presumed if a petitioner proves their symptoms appeared within a specified time frame after receiving a covered vaccine. *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1341–42 (Fed. Cir. 2010) (first citing 42 U.S.C. § 300aa-11(c)(1)(C)(i); and then citing *Andreu ex rel. Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1374 (Fed. Cir. 2009)). Off-Table injuries, by contrast, require proof that the injury was caused-in-fact by a covered vaccine. *Id.* at 1342 (first citing *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); and then citing 42 U.S.C. § 300aa-11(c)(1)(C)(ii)).

⁸ Ms. Cavanaugh did not plead or formally develop an off-Table claim before the OSM. Instead, she waited until filing her post-hearing briefs to cursorily suggest an off-Table injury as an alternative basis for relief. The special master denied the undeveloped claim because Ms. Cavanaugh neither pled

Following reassignment, the special master conducted a fact hearing on August 2, 2024, where both Ms. Cavanaugh and her daughter testified. Then, on November 20, 2025, the special master issued a decision denying compensation, finding that Ms. Cavanaugh had not carried her burden of proving a Table injury of SIRVA by preponderant evidence. As discussed below, the special master analyzed each of the four SIRVA prongs and determined Ms. Cavanaugh had carried her burden on only the first (i.e., whether she had "[n]o history of pain, inflammation or dysfunction of the affected shoulder" from before her flu shot that could have explained her post-vaccination symptoms). A325; *see* 42 C.F.R. § 100.3(c)(10). On the remaining three prongs, the special master weighed the relevant evidence and determined Ms. Cavanaugh failed to prove (1) an onset of right-shoulder pain within forty-eight hours after her flu shot, (2) pain and reduced range of motion that was limited to her right shoulder, and (3) freedom from any other condition or abnormality that would alternatively explain her symptoms. Ms. Cavanaugh timely filed a motion for review on December 19, 2025.

## DISCUSSION

I.    Standard of Review

On a motion for review, this Court will uphold a special master's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Sheller v. Sec'y of Health & Hum. Servs.*, 121 F.4th 1301, 1305 (Fed. Cir. 2024) (first quoting *James-Cornelius ex rel. E.J. v. Sec'y of Health & Hum. Servs.*, 984 F.3d 1374, 1379 (Fed. Cir. 2021); and then citing 42 U.S.C. § 300aa-12(e)(2)(B)). The Court "do[es] not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder." *Winkler v. Sec'y of Health & Hum. Servs.*, 88 F.4th 958, 963 (Fed. Cir. 2023) (quoting *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011)). A special master's application of law, however, is reviewed de novo. *Sheller*, 121 F.4th at 1305 (citing *Simmons v. Sec'y of Health & Hum. Servs.*, 875 F.3d 632, 635 (Fed. Cir. 2017)).

As the movant, Ms. Cavanaugh bears the burden to demonstrate reversible error in the special master's decision. *Simanski v. Sec'y of Health & Hum. Servs.*, 115 Fed. Cl. 407, 457 (2014), *aff'd sub nom.*, *Simanski v. Dep't of Health & Hum. Servs.*, 601 F. App'x 982 (Fed. Cir. 2015). Where the special master did not commit the asserted error, the special master's decision will be upheld. *See Dixon v. Sec'y of Dep't of Health & Hum. Servs.*, 61 Fed. Cl. 1, 12 (2004).

---

an off-Table injury in her petition nor described her off-Table injury in her motion for a ruling on the record. Ms. Cavanaugh does not challenge that ruling here.

II.    Analysis

To prove a Table injury of SIRVA, a petitioner must prove each of the following four prongs by preponderant evidence:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10); *accord* 42 U.S.C. § 300aa-13(a)(1)(A).  As to the second prong—the focus of Ms. Cavanaugh's motion for review[9]—the specified time frame within which shoulder pain must occur is forty-eight hours post-vaccination. 42 C.F.R. § 100.3(a).

Ms. Cavanaugh limits her argument to the forty-eight-hour prong of the SIRVA analysis, arguing that the special master erred by "effectively creating a bright-line rule rejecting SIRVA claims when a petitioner's medical records in the approximately two weeks following vaccination do not specifically address SIRVA." ECF 72 at 2.  Far from establishing a bright-line rule rejecting SIRVA claims if contemporaneous medical records fail to mention or address the Table injury, the OSM explained:

[A] special master may find the time period for the first symptom or manifestation of onset required for a Table Injury is satisfied "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." [42 U.S.C.] § 300aa-13(b)(2). However, such a finding must in all events be supported by preponderant evidence. *Id.*

---

[9] In her motion for review and memorandum of objections, Ms. Cavanaugh does not challenge the special master's additional adverse findings on two other essential prongs: whether she suffered pain and reduced range of motion limited to her right shoulder, and whether she was free of any other condition or abnormality that could explain her symptoms.  Consequently, those issues are waived. *Kindle v. Sec'y of Health & Hum. Servs.*, 177 Fed. Cl. 689, 704 n.13 (2025) (collecting cases).  Even if Ms. Cavanaugh could prevail as to the forty-eight-hour prong, there would be no basis to remand this case for further proceedings.

A326.

The special master then turned, as required, to Ms. Cavanaugh's contemporaneous medical records. *Id.* (citing *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993) ("Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events.")); *see* 42 U.S.C. § 300aa-13(b)(1). The closest-in-time medical record to Ms. Cavanaugh's vaccination was her January 16, 2020 email to her doctor—created within the critical forty-eight-hour post-vaccination window. As the OSM observed, and as noted above, notwithstanding the detailed account of Ms. Cavanaugh's reported reaction to the flu shot, the email made no mention of shoulder injury or pain. The same is true for the medical records generated during Ms. Cavanaugh's January 29, 2020 in-person follow-up appointment.

If the special master had confined his analysis to these two medical records and concluded therefrom that Ms. Cavanaugh could not possibly prove onset of shoulder pain in the forty-eight hours post-vaccination, then the assertion that the special master relied on an improper bright-line rule might have had merit. But that is not the case presented.

Instead, the special master weighed the contemporaneous medical records against Ms. Cavanaugh's subsequent medical history, her and her daughter's hearing testimony, and her daughter's written statement. In doing so, the OSM was clear that Ms. Cavanaugh bore the difficult—but not insurmountable—burden to show that her contemporaneous medical records were not due the substantial weight usually afforded such records, either because of some flaw within the four corners of those records or because later-in-time documentary evidence and testimony trumped them. *See, e.g.*, A327 ("When witness testimony is offered to overcome the weight generally afforded to contemporaneous medical records, such testimony must be 'consistent, clear, cogent[,] and compelling.'" (quoting *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998))). Such weighing falls perfectly within the special master's discretion. *R.J. ex rel. W.J. v. Sec'y of Health & Hum. Servs.*, 93 F.4th 1228, 1235 (Fed. Cir.) ("It is within a special master's discretion to weigh evidence." (citing *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 871 (Fed. Cir. 1992)), *cert. denied*, __ U.S. __, 145 S. Ct. 440 (2024) (mem.); *e.g.*, *Dixon*, 61 Fed. Cl. at 11 (rejecting argument that OSM legally erred because the challenged "legal" conclusion was really a factual determination "fall[ing] squarely within the Special Master's unique purview to which this court must defer" (first citing *Burns ex rel. Burns v. Sec'y of the Dep't of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993); and then citing *Hines ex rel. Sevier v. Sec'y of Dep't of Health & Hum. Servs.*, 940 F.2d 1518, 1527 (Fed. Cir. 1991)).

7

While the special master did assign substantial weight to the contemporaneous medical records, he did so as a matter of fact, not by operation of law.  Indeed, the special master explained specifically that contemporaneous medical records are not always afforded substantial weight, but that they were *in this case* largely because Ms. Cavanaugh did not dispute their accuracy.  A327.  The special master "place[d] still further weight on [the January 16, 2020] e-mail because it represents [Ms. Cavanaugh]'s own firsthand account."[10]  *Id.* (citation omitted).  Ms. Cavanaugh also overstates the significance the OSM placed on the mere fact that her contemporaneous medical records failed to discuss her shoulder pain.  As the special master explained, the absence of such discussion was not particularly probative on its face but was forceful here because Ms. Cavanaugh's other symptoms were documented in great detail.  *Id.* ("Furthermore, the contemporaneous records represent detailed, consistent, and seemingly complete, accounts of petitioner's initial vaccine reaction, which include no report of shoulder pain."); *cf. Veir & Co. v. United States*, 56 Fed. Cl. 30, 41 (noting, in a contract dispute, that "[t]he absence of [a] daunting task from [a] schedule [containing] much smaller tasks [that] were specified in detail" compelled the court to conclude that the "daunting task" was not contemplated by the schedule), *aff'd mem.*, 83 F. App'x 322 (Fed. Cir. 2003) (per curiam).

The special master then found that Ms. Cavanaugh's countervailing, later-in-time evidence deserved less weight—again, under the facts of this case rather than by operation of law.  In evaluating Ms. Cavanaugh's first documented complaints of shoulder pain—made during her May 8, 2020 virtual visit with her doctor—the special master found that the evidence was due less weight than the contemporaneous records because "th[e May 8, 2020] record is further removed from the events at issue . . . ."  A328.  The special master further found, in any case, that the May 8, 2020 record was not probative of whether Ms. Cavanaugh's shoulder pain began in the critical forty-eight-hour post-vaccine window, as it merely indicated her shoulder pain began sometime "after" the flu shot.[11]  *Id.*  The special master also highlighted several inconsistencies in Ms. Cavanaugh's statements and hearing testimony, finding such evidence "not credible enough to outweigh the contemporaneous medical records."  A329.  The special master found it "difficult to square" Ms. Cavanaugh's failure to mention shoulder pain in her January 16, 2020 email with her testimony that her only remaining symptom at that time was shoulder

---

[10] Other medical records, such as those prepared by a medical professional or administrative staff, might receive less weight because the recorded information may be a paraphrased (as opposed to verbatim) patient account; information may be misreported; or the data may include typographical errors.  An example here reportedly lies in the pharmacy's documentation that the flu shot was administered in Ms. Cavanaugh's left shoulder.

[11] To this point, the special master explained, "the record strongly suggests that the encounter was prompted by a recent change in petitioner's condition, which clouds the purported association to her prior vaccination."  *Id.*  The special master then noted Ms. Cavanaugh's recent physical exertion (i.e., cleaning out her garage).

pain. *Id.* The special master was also troubled by the fact that it was Ms. Cavanaugh who drafted her daughter's statement (and that she did so "for purposes of litigation"), thereby undermining her daughter's independent recollection of events. A330. Weighing this evidence against the contemporaneous medical records, the special master determined Ms. Cavanaugh simply did not carry her burden of proof.

At bottom, the special master thoroughly examined and weighed the documentary evidence and testimony in determining, among other things, that Ms. Cavanaugh failed to prove by preponderant evidence that she experienced the onset of shoulder pain in the critical forty-eight-hour post-vaccination window. One can imagine a situation—not presented here—where a petitioner's medical records from the approximately two weeks post-vaccination make no mention of shoulder pain, yet there is sufficient countervailing evidence to warrant a finding that the petitioner's shoulder pain began in the critical two-day window. The special master's fact-intensive inquiry did not foreclose that possibility for Ms. Cavanaugh as a matter of law; it merely concluded that she did not carry her burden as a matter of fact. Accordingly, the motion for review is denied, and the OSM decision is upheld.

## CONCLUSION

For the foregoing reasons, petitioner's motion for review (ECF 72) is **DENIED** and the decision of the OSM (ECF 70) is **UPHELD**. Pursuant to the OSM's decision (ECF 70 at 21) and Rule 30(a) of the Vaccine Rules, Ms. Cavanaugh's petition (ECF 1) is **DISMISSED**, and the Clerk of Court is directed to **ENTER** judgment accordingly.

It is so **ORDERED**.

_____
Armando O. Bonilla
Judge